## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 26 2019, 7:12 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Daniel J. Vanderpool
Vanderpool Law Firm, PC
Warsaw, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Natalie F. Weiss
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of N.N., Mother, D.D., Father, and A.D., Child,

D.D.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

August 26, 2019

Court of Appeals Case No. 19A-JT-611

Appeal from the Wabash Circuit Court

The Honorable Robert R. McCallen, III, Judge

Trial Court Cause No. 85C01-1810-JT-13

**Kirsch, Judge.**

[1] D.D. ("Father") appeals the juvenile court's order terminating his parental rights to his minor child, A.D. ("Child"). Father raises the following restated issue on appeal: whether the juvenile court's judgment terminating his parental rights was supported by clear and convincing evidence.

[2] We affirm.

## Facts and Procedural History

[3] Father and N.N. (" Mother"),[1] who were never married, are the parents of Child, born on May 18, 2012. Shortly after Child's birth, Mother placed her with Mother's sister, T.J., in T.J.'s home. At that time, T.J. also had two of Mother's other children in her home. When Child was born, Father was incarcerated, although he was not initially aware that he was the biological father of Child. In July 2013, he began the process of establishing paternity, which took some time to complete because of his incarceration, but paternity was ultimately established on December 28, 2015.

[4] On November 7, 2016, the Indiana Department of Child Services ("DCS") removed Child from the care of Father due to allegations of neglect or abuse. *Appellant's App. Vol. II* at 23. When Child was removed from the care of Mother and Father, she remained in the home of T.J. DCS had received a report that Mother was using THC and that one of Child's siblings was a drug-

---

[1] Mother's parental rights were also terminated on February 15, 2019 in the same order that terminated Father's parental rights. However, Mother does not join in this appeal. We will, therefore, confine the facts to only those pertinent to Father's appeal.

exposed infant and had tested positive for THC. *Tr. Vol. 2* at 7. Father was incarcerated at the time Child was removed. *Id*. at 12.

[5] On November 10, 2016, DCS filed a petition alleging that Child was a child in need of services ("CHINS"). *Appellant's App. Vol. II* at 23. A fact-finding hearing was held on the CHINS petition, at which evidence was heard to support the CHINS petition, and Father admitted that Child was a CHINS. On March 31, 2017, the juvenile court adjudicated Child to be a CHINS based in part on Father's incarceration. *Id*.; *Tr. Vol. 2* at 15. A dispositional hearing was held, and on April 13, 2017, the juvenile court entered a dispositional decree. *Appellant's App. Vol. II* at 23. Under the dispositional decree, the juvenile court ordered Father to, among others things: (1) contact DCS every week; (2) notify DCS of any change in address or employment; (3) notify DCS of any arrest or criminal charges; (4) allow DCS and other service providers to make unannounced visits to the home; (5) obtain any required assessments within thirty days and enroll and participate in any recommended programs; (6) keep all appointments with DCS and service providers; (7) maintain suitable, safe, and stable housing; (8) secure and maintain a legal and stable source of income; (9) not use, distribute, or sell any illegal controlled substances; (10) obey the law; (11) complete a parenting assessment and complete all recommendations; (12) complete a substance abuse assessment and follow all treatments; (13) attend all scheduled visitations with Child and comply with visitation rules; and (14) submit to random drug screens. *Appellee's App. Vol. 2* at 39-41.

[6] On October 9, 2018, DCS filed a petition to terminated Father's parental rights to Child. A hearing on that petition was held on February 12, 2019, and evidence was heard regarding Father's compliance with the juvenile court's orders. Family case manager Alicia Lopez ("FCM Lopez") testified that Father had made little effort to remedy the reasons for removal and had not made any effort toward reunification. *Tr. Vol. 2* at 11. Although Father had completed some parenting classes while incarcerated in 2017, he did not complete a parenting assessment. *Id*. at 9. Father submitted to the one drug screen required of him on October 10, 2017. *Id*. Father participated in five out of eleven scheduled visitations with Child, but he had not had any visitations since October 4, 2017. *Id*. at 9-10. Although Father claimed there were issues with transportation, the visitation provider was able to bring Child to Father. *Id*. at 14. FCM Lopez testified that Father had not participated in any services through DCS since October 2017. *Id*. at 10.

[7] Evidence was presented that Father had a lengthy criminal history and had been frequently incarcerated. Prior to DCS involvement and prior to Child's birth, on August 12, 2011, Father was sentenced to jail for domestic battery. *Appellee's App. Vol. 2* at 65-67. On October 22, 2012, Father was incarcerated for dealing in methamphetamine, a Class B Felony. *Id*. at 77-79. He was incarcerated again in December 2015 for operating a vehicle with an ACE of at least .08. *Id*. at 80-85. Father was incarcerated again on October 6, 2016 for domestic battery as a Level 6 felony. *Id*. at 86-92. He was released from Heritage Trail Correctional Facility ("Heritage") on August 20, 2017. *Tr. Vol. 2*

at 27.  While at Heritage, Father participated in parenting classes and completed a substance abuse program and a cognitive based program, Thinking for Change.  *Id*. at 27, 31-33.  Father was again incarcerated in April 2018 for domestic battery with a prior conviction as a Level 5 felony.  *Appellee's App. Vol. 2* at 93-96, 100-01.

[8]  At the time of the termination hearing, Father was still incarcerated at Heritage.  *Tr. Vol. 2* at 15.  His earliest possible release date was April 2021, although Father claimed he would be released in 2019.  *Id*. at 33, 43.  At the time of the hearing, Child was six years old, and Father had only been out of jail for a total of eighteen months since the date of Child's birth.  *Id*. at 49.  FCM Lopez testified that Father's incarceration indicated that the issues prompting Child's removal had not been remedied.  *Id*. at 15-16.  When asked how much longer Child should have to wait for permanency, Father testified that he believed Child should continue to wait for "[h]owever long God see [sic] fit for [him] . . . to get [his] life together."  *Id*. at 46.  At the time of the termination hearing, Child was thriving and doing well in her placement with T.J.  *Id*. at 18.  All of her needs were being met, and she was doing "amazing" in school.  *Id*. at 18, 21.  Both the CASA and FCM Lopez recommended termination of Father's parental rights.  *Id*. at 11, 18-19.  On February 15, 2019, the juvenile court issued its order terminating Father's parental rights to Child.  Father now appeals.

## Discussion and Decision

As our Supreme Court has observed, "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive -- so we review them with great deference to the trial courts[.]" *E.M. v. Ind. Dep't of Child Servs.*, 4 N.E.3d 636, 640 (Ind. 2014). While the Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his child and parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet his responsibility as a parent. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005); *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013). The purpose of terminating parental rights is not to punish the parent but to protect the child. *In re D.P.*, 994 N.E.2d 1228, 1231 (Ind. Ct. App. 2013). Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id.* The juvenile court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re H.L.*, 915 N.E.2d 145,

149 (Ind. Ct. App. 2009). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id*. Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id*. at 148-49. A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *In re S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004).

[11] Where, as here, the juvenile court entered specific findings and conclusions, we apply a two-tiered standard of review. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. A finding is clearly erroneous only when the record contains no facts or inferences drawn therefrom that support it. *Id*. If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[12] Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re H.L.*, 915 N.E.2d at 149. Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

[13] Father argues that the juvenile court erred in finding that DCS met its burden of proof to support termination of his parental rights. Specifically, Father contends that DCS failed to prove that there was a reasonable probability that the conditions that resulted in Child's removal or the reasons for placement outside of the home would not be remedied because Child was removed due to Mother's drug use while pregnant with a new baby. He asserts that, although the record shows that he was incarcerated for a significant period of time during Child's life, he actively participated in services, even when he was incarcerated, including programs related to parenting, stress and anger management, and substance abuse. As to his frequent incarceration, he further claims that DCS

did not order as a requirement that he not be re-incarcerated. Father also argues that DCS failed to present by clear and convincing evidence that termination was in Child's best interests because there was significant evidence that he could and would make the changes necessary to be a competent father.

### *Remediation of Conditions*

[14] In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home would not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we must ascertain what conditions led to the child's placement and retention in foster care, and, second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *E.M.*, 4 N.E.3d at 643 (quoting *K.T.K.*, 989 N.E.2d at 1231). Pursuant to this rule, "trial courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *In re D.B.*, 942 N.E.2d 867, 873 (Ind. Ct. App. 2011). In addition, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Involuntary*

*Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *E.M.,* 4 N.E.3d at 643. When determining whether the conditions for the removal would be remedied, the trial court may consider the parent's response to the offers of help. *D.B.,* 942 N.E.2d at 873.

[15] Here, the conditions that led to Child's removal were Mother's drug use and Father's unavailability to parent Child due to his incarceration. *Tr. Vol. 2* at 7, 12. Father remained incarcerated for significant periods of time while this case was pending. At the time, Child was removed on November 7, 2016, Father was incarcerated for domestic battery as a Level 6 felony, after being sentenced on October 6, 2016. *Appellee's App. Vol. 2* at 86-92. He was released from Heritage on August 20, 2017. *Tr. Vol. 2* at 27. Father was again incarcerated in April 2018 for domestic battery with a prior conviction as a Level 5 felony. *Appellee's App. Vol. 2* at 93-96, 100-01. At the time of the termination hearing, Father was still incarcerated at Heritage, and his earliest possible release date was April 2021. *Tr. Vol. 2* at 15, 33. At the time of the hearing, Child was six years old, and Father had only been out of jail for a total of eighteen months since the date of Child's birth. *Id.* at 49.

[16] Father's criminal history shows a pattern of engaging in criminal activity and being incarcerated with little time out of incarceration during Child's lifetime. Therefore, this "habitual pattern of conduct" demonstrates that there is a "substantial probability of future neglect or deprivation." *E.M.*, 4 N.E.3d at 643

(citations and quotations omitted). Additionally, FCM Lopez testified that Father's incarceration at the time of the termination hearing, for which he would not be released until 2021, indicated that the conditions leading to removal and continued placement had not been remedied. *Tr. Vol. 2* at 15-16. We, therefore, conclude that the juvenile court's conclusion that Father would not remedy conditions that resulted in removal was not clearly erroneous.

[17] Father's contends that he had participated in programs while incarcerated and complied with a majority of the DCS requirements in the case plan, that DCS did not require Father to remain out of incarceration, and that he testified that he planned to be out of incarceration within eighteen months and to support Child by working in the food industry. Father's contentions are all requests to reweigh the evidence, which we will not do. *In re H.L.*, 915 N.E.2d at 149. The evidence presented showed that Father did not comply with all of DCS's requirements. FCM Lopez testified that, although Father participated in some parenting classes while incarcerated, he failed to complete a parenting assessment. *Tr. Vol. 2* at 9. She also stated that Father failed to complete a substance abuse assessment, attended only five out of eleven scheduled visitations with Child, and had not participated in any services through DCS since October 2017. *Id*. at 9-10. Further, contrary to Father's contention, the dispositional order clearly required him to obey the law, and the evidence of his repeated incarcerations while the case was pending demonstrate that he failed to do so. *Appellee's App. Vol. 2* at 40. Finally, as to Father's plans for employment after his release from incarceration, the juvenile court did not find

his testimony credible. In its order terminating Father's parental rights, the juvenile court stated, "The Court has dealt with [Father] on more than one occasion. The Court's experience is that [Father] is very good at saying what he thinks the listener wants to hear. However, he fails to follow through as promised." *Appellant's App. Vol. II* at 17. The juvenile court was free to disbelieve Father's testimony about his plans after incarceration, and we do not judge witness credibility. *In re H.L.*, 915 N.E.2d at 149. The juvenile court's determination that the conditions that resulted in removal would not be remedied was not clearly erroneous.

### Best Interests

[18]   In determining what is in the best interests of the child, a trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*), *trans. dismissed*. In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *Id.* (citing *In re R.S.*, 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*). A parent's historical inability to provide a suitable, stable home environment along with the parent's current inability to do so supports a finding that termination is in the best interest of the child. *In re A.P.*, 981 N.E.2d 75, 82 (Ind. Ct. App. 2012). Testimony of the service providers, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that

termination is in the child's best interests. *In re A.S.*, 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied*.

[19]    Father contends that the juvenile court should have given him more time to meet the DCS requirements. However, a trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re A.K.*, 924 N.E.2d at 224. Additionally, a child's need for permanency is an important consideration in determining the best interests of a child. *Id.* (citing *McBride v. Monroe Cty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)). At the time of the termination hearing, Child had been removed for over two years, and Father had failed to make the changes in his life necessary to provide Child with a safe and healthy environment. As discussed above, DCS presented sufficient evidence that there was a reasonable probability that Father would not remedy the reasons for Child's removal. The CASA and FCM Lopez both testified that they believed termination of Father's parental rights would be in Child's best interests. *Tr. Vol. 2* at 11, 18-19. Based on the totality of the evidence, we conclude that the evidence supported the juvenile court's determination that termination of Father's parental rights was in Child's best interests. Father's arguments to the contrary are a request for this court to reweigh the evidence, which we cannot do. *In re H.L.*, 915 N.E.2d at 149.

[20] Based on the record before us, we cannot say that the juvenile court's termination of Father's parental rights to Child was clearly erroneous. We, therefore, affirm the juvenile court's judgment.

[21] Affirmed.

Baker, J., and Crone, J., concur.